**THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**COOKEVILLE DIVISION**

---

| | | |
|---|---|---|
| JAMES MCKINNIE, LONNIE MCKINNIE, LARRY ROBERTS, and TINA ROBERTS individually and on behalf of all others similarly situated, | ) ) ) ) ) | |
| | ) | Case No. 2:17-cv-00048 |
| Plaintiffs, | ) ) | JUDGE CRENSHAW |
| vs. | ) ) | MAGISTRATE JUDGE BROWN |
| STATE FARM FIRE and CASUALTY COMPANY, | ) ) ) | JURY DEMAND |
| Defendant. | ) ) | |

---

### FIRST AMENDED CLASS ACTION COMPLAINT

---

COME NOW the Plaintiffs James McKinnie, Lonnie McKinnie, Larry Roberts, and Tina Roberts, individually and on behalf of a class of all others similarly situated (collectively "Plaintiffs"), and state and allege as follows for their First Amended Complaint against Defendant State Farm Fire and Casualty Company ("State Farm"):

### PARTIES, JURISDICTION, AND VENUE

1.      Plaintiffs James McKinnie and Lonnie McKinnie are husband and wife, and citizens and residents of Putnam County, Tennessee. Plaintiffs Larry Roberts and Tina Roberts are husband and wife, and citizens and residents of White County, Tennessee. At all times relevant hereto, Plaintiffs collectively owned commercial structures located at 650 North Spring Street and 654 North Spring Street in Sparta, Tennessee (the "Insured Premises").

2.     State Farm is organized under the laws of the State of Illinois and headquartered in Bloomington, Illinois. State Farm is authorized to sell homeowner and property insurance policies in the State of Tennessee, and is engaged in the insurance business in the State of Tennessee.

3.     The events giving rise to the individual claims that are the subject of this action occurred in White County, Tennessee. State Farm has insurance agents and claims adjusters in White County, Tennessee for the conduct of its usual and customary business, including the sale of homeowner and property insurance policies and the handling of claims made thereon.

4.     State Farm has removed this lawsuit, claiming jurisdiction and venue are proper in this Court.

## SUMMARY OF CLAIMS

5.     Plaintiffs bring individual and putative class claims for breach of contract and bad faith arising out of State Farm's refusal to pay prime contractor's overhead and profit to Plaintiffs associated with the estimated cost to reconstruct the commercial structures due to a covered loss. Plaintiffs bring individual claims associated with other breaches of contract by State Farm relating to its failure to pay Plaintiffs other amounts due under the subject insurance policy. Plaintiffs also seek extra-contractual damages, including punitive damages and the twenty-five percent (25%) statutory bad faith penalty.

## INDIVIDUAL FACTS

6.     At all times relevant hereto, Plaintiffs were the insureds pursuant to an insurance contract whereby State Farm agreed to insure the Insured Premises against property damage, bearing Policy No. 92-BU-D764-3 (the "Policy"). As relevant hereto, the term of the Policy was December 23, 2014 to December 23, 2015.

7.     Relevant portions of the Policy are attached as **Exhibit A**.

2

8.     The Insured Premises consist of two buildings (650 and 654 North Spring Street, Sparta, Tennessee) connected by a breezeway, as depicted in the aerial image below:



South

9.     The Policy provided insurance coverage for accidental direct physical loss to the structures located on the Insured Premises, except as specifically excluded or limited by the Policy.

10.     The Policy contained an endorsement which provided that coverage would be provided on an "actual cash value" valuation basis. "Actual cash value" is determined by subtracting depreciation from "replacement cost value."

11.     Pursuant to the Policy, Plaintiffs paid State Farm an annual premium in exchange for insurance coverage. The required premiums were paid at all times relevant to this Amended Complaint.

12.     On July 14, 2015, Plaintiffs' buildings located on the Insured Premises suffered extensive damage by hail (the "Loss").

13.     To restore the buildings from the damage caused by the Loss, the entire roofs (more than 200,000 square feet) must be replaced. Additionally, and as a natural consequence of the hail damage and/or the replacement of the roofs, the buildings' skylights, ridge end caps, ridge vents, ridge cap flashing, eave trim, gable trim, etc. must be replaced.

14.     The Policy was in effect at the time of the Loss, and the Loss is compensable under the terms of the Policy. As it relates to the Loss, there is no applicable exclusion.

15.     On or about January 16, 2017, State Farm inspected Plaintiffs' property damage and determined that the Loss was covered by the terms of the Policy.

16.     State Farm has issued multiple estimates of the total property damage incurred by the Insured Premises due to the Loss.

17.     State Farm calculated its estimates through Xactimate, a software estimating program manufactured by Xactware Solutions, Inc.

18.     By Xactimate estimate dated June 2, 2017 (the last estimate received by the Plaintiffs from State Farm), State Farm determined that the replacement cost value of the damage caused by the Loss to Plaintiffs' building located at 654 North Spring Street was $556,354.26 at the time of loss. After applying depreciation, State Farm determined the actual cash value to be $479,993.39.

19.     By Xactimate estimate dated June 2, 2017 (the last estimate received by the Plaintiffs from State Farm), State Farm determined that the replacement cost value of the damage caused by the Loss to Plaintiffs' building located at 650 North Spring Street was approximately $419,768.97 at the time of loss. After applying depreciation, State Farm determined the actual cash value to be $362,932.66.

20.     State Farm provided its estimates to Plaintiffs, which reflected the totals stated in paragraphs 18 and 19 above. The estimates are attached hereto as **Exhibit B**. For clarity, State Farm's estimates refer to the 654 North Spring Street building as the "Front Building" and the 650 North Spring Street building as the "Rear Building." Each building is set apart into separate estimates.

21.     On the cover page of each estimate, State Farm provides written guidance concerning its "Structural Damage Claim Policy," which stated: "Depending upon the complexity of your repair, our estimate may or may not include an allowance for general contractor's overhead and profit. If you have questions regarding general contractor's overhead and profit and whether general contractor services are appropriate for your loss, please contact your claim representative before proceeding with repairs."

22.     With respect to the loss at 654 North Spring Street (the "Front Building"), and in its Xactimate estimate, State Farm agreed that reconstruction of the loss would require approximately 55 hours of "commercial supervision / project management" time, as defined by the Xactimate software program.

23.     With respect to the loss at 650 North Spring Street (the "Rear Building"), and in its Xactimate estimate, State Farm agreed that reconstruction of the loss would also require approximately 55 hours of "commercial supervision / project management" time, as defined by the Xactimate software program.

24.     In the Xactimate software program, "commercial supervision / project management" time is defined as the time required for a "Superintendent/Project Manager" "to manage commercial jobs where Supervision/Project Management is *needed to coordinate the work of subcontractors*, or perform other project management duties." Further, "[a] Superintendent/Project Manager may complete tasks such as, but not limited to, create / *maintain project schedules, coordinate / meet trades*, order materials, inspect job sites, obtain permits, meet with inspectors, etc."

5

## THE RECONSTRUCTION OF PLAINTIFFS' COMMERCIAL STRUCTURES REQUIRED THE USE OF A LICENSED "PRIME CONTRACTOR"

25.     The Tennessee Contractor's Licensing Act ("TCLA") governs the licensing of contractors and "prime contractors" in the State of Tennessee. Tenn. Code Ann. § 62-6-101, *et seq*.

26.     For certain construction projects exceeding a monetary threshold, only a licensed contractor can act as a "prime contractor" in the State of Tennessee.

27.     The Tennessee Department of Commerce and Insurance states on its website: "NOTICE! A Tennessee contractor's license is required BEFORE bidding or offering a price, for projects $25,000 and up (includes materials and labor), *as a prime (general) contractor*; and also subcontractors performing electrical, mechanical, plumbing, HVAC, roofing and masonry are also required to be licensed as a contractor, when the total portion on the project is $25,000 or more; masonry, when $100,000 or more." This guidance is consistent with the TCLA and its accompanying regulations.

28.     Under the TCLA, only a "prime contractor" can legally contract with the owner of a property. The TCLA defines a "prime contractor" as "one who contracts directly with the owner."

29.     A "prime contractor," as contemplated by the legislature in the TCLA, and a "general contractor" (as commonly referred to in the construction industry) are synonymous both in law and fact.

30.     "Prime/General contractors" are those that contract directly with the owner of the property to perform the entirety of the construction work (as opposed to a portion of the work), and "subcontractors" are those who are engaged by the "prime/general contractor" to perform a part of the work undertaken by the "prime/general contractor."

6

31.     The reconstruction project at 654 North Spring Street mandated the use of a licensed "prime contractor" under Tennessee law.

32.     The reconstruction project at 650 North Spring Street mandated the use of a licensed "prime contractor" under Tennessee law.

33.     With respect to the Loss, Plaintiffs consulted with Titan Exteriors, Inc. ("Titan") to estimate the damage to the commercial structures and to potentially perform the reconstruction work necessitated by the Loss.

34.     At all relevant times hereto, Titan was authorized by the Tennessee Board of Licensing Contractors to act as a "prime contractor" with respect to commercial building reconstruction in the State of Tennessee.

35.     A true and correct copy of Titan's licensure to act as a "prime contractor" is depicted below:



36.     It is unlawful for any person, firm, or corporation to engage in or offer to engage in prime contracting for any project in Tennessee, unless, at the time of such engagement or offer to engage, the person, firm, or corporation has been duly licensed with a monetary limitation sufficient to allow the person, firm, or corporation to engage in or offer to engage in such contracting project. Any person, firm, or corporation that engages in or offers to engage in prime contracting without a license commits a Class A misdemeanor. Violators of the TCLA's licensing rules are also subject to civil penalties, citations, and penalties authorized by the Tennessee Consumer Protection Act.

### THE GENERAL OVERHEAD A LICENSED PRIME CONTRACTOR MUST INCUR UNDER STATE LAW

37.     The Tennessee Board of Licensing Contractors does *not* permit a tradesman or specialized construction company, proficient in only one or two trades, to directly contract with an owner to reconstruct damaged homes or buildings in projects exceeding the monetary thresholds of the TCLA.

38.     Rather, when a job exceeds $25,000, there is a requirement for employment of a prime contractor, and that prime contractor must in turn employ and carry overhead relating to several matters, including but not limited to having full-time employee or ownership proficient in, and responsible for, all aspects of all of the building trades described below. The contracting entity must also have sufficient assets, net worth, and broad experience.

39.     Mandating that Tennessee reconstruction projects exceeding a certain monetary threshold be performed by a licensed prime contractor skilled in a broad variety of trades and have substantial assets and net worth (as opposed to a skilled tradesman or specialized subcontractor), ensures that larger Tennessee construction projects are not conducted in a deficient manner (due

to the narrower focus, experience, and resources that a skilled tradesman or specialized contractor might implement).

40.     To obtain a license authorizing an entity to act as a prime contractor in these circumstances, an entity must have a "qualifying agent" ("QA").

41.     The QA must be one or more full-time employees of the prime contractor, or an officer of the contracting entity, or the owner of the contracting entity itself.

42.     To hold a commercial contractor license, the QA must prove proficiency and experience in all of the following building trades: sitework, footings, foundation, concrete, concrete reinforcement, masonry, metals, carpentry, roofing, estimating, plan reading, code requirements, associated trades, and OSHA safety.

43.     While an unlicensed or specialized subcontractor or skilled tradesman may, for example, perform work within these trade categories in the State of Tennessee, those persons must work through a Tennessee licensed prime contractor when working on larger projects, all as set forth fully in the TCLA and its accompanying regulations.

44.     Further, every Tennessee licensed prime contractor is assigned a monetary limit on their contractor's license, which provides a limitation on the size of project it may seek to contract or bid as a prime contractor. This limit must cover the total project and cannot be split into phases of smaller contracts to circumvent the law. The total contract price includes materials, labor, profit, and all other costs associated with the project.

45.     Titan's project size monetary limit, as depicted on its licensure, is $1,500,000.

46.     Project size monetary limits are based on a factor of a construction company's working capital, as well as its net worth (i.e., assets less liabilities). Without incurring the overhead

9

associated with both working capital and sufficient company related assets (e.g., buildings, construction equipment), an entity cannot act as a prime contractor within the State of Tennessee.

47.     Further, even if the entity has sufficient working capital and assets to bid a job as a prime contractor, and has a QA, the licensing board can further limit the entity's project size monetary limit if the contractor lacks a sufficiently broad level of experience.

48.     Further, every prime contractor must also incur general and administrative overhead expenses associated with the Tennessee licensure application process above and beyond that of a tradesman, including attendant general insurance, legal, financial institution, and accounting expenses.

49.     As a result, a licensed prime contractor will have to incur all of the general overhead expenses associated with training and retaining full-time employee(s) with proven proficiency in a broad array of labor trades; maintaining sufficient liquidity, assets, and net worth to bid a job; having a broad level of experience; and incurring all of the general and administrative expenses attendant and associated with state licensure.

## STATE FARM'S REFUSAL TO PAY FOR THE CATEGORIES OF GENERAL OVERHEAD AND PROFIT INCURRED BY A PRIME CONTRACTOR

50.     Xactimate allows an insurance adjuster to choose whether or not to provide full payment for a prime contractor's overhead and profit when calculating replacement cost value.

51.     When State Farm adjusted the Loss, it purposely manipulated Xactimate to disallow overhead and profit for a prime contractor.

52.     That act was intentional and done with malice, and done in accordance with State Farm internal policies.

53.     The manipulation of Xactimate by State Farm eliminated payment for the following categories of "generalized" overhead and profit payments to the Plaintiffs for their Loss: any and

all overhead that is *not* directly attributable to an individual construction project, such as any and all General and Administrative (G&A) expenses, payroll expenses, office and building rent and maintenance, management and ownership wages and benefits, utilities, office supplies, salaries for office and sales personnel, office equipment, payroll and construction related software, the costs of ongoing licensure, training of employees, full-time employment of a QA, audit, accounting, tax and legal fees, advertising, etc., as well as profit.

54. All of the foregoing "generalized" expenses may be added to the estimate by clicking a box in Xactimate.

55. Rather, State Farm manipulated Xactimate to only pay so-called "job-related" overhead. "Job-related" overhead from an accounting perspective and as described herein is a limited type of overhead that would be incurred by a single, unlicensed tradesman or a small, unlicensed subcontractor working a job and is directly related to the job, such as a temporary power line to a jobsite, or depreciation on a tradesman's hand-tool or the burdened rate of a single worker—and purposely excludes any of the overhead costs associated with Tennessee licensure, such as the retention of a QA, as well as having the necessary ongoing business liquidity and business assets unrelated to a job.

56. All of the overhead and profit needed to operate the business of a licensed prime contractor in Tennessee—such as having an office location, office support, office management, payroll support, sales support, accounting, software and auditing expenses, state licensure fees and insurance requirements, G&A expenses and the full-time employment of a QA, were purposely excluded by State Farm in its payment.

57. All of the categories of overhead and profit expenses described in paragraph 53 were purposely excluded from State Farm's payment.

58.     State Farm made its payment to the Plaintiffs without providing for any of the overhead and profit expenses of a licensed prime contractor described in paragraph 53.

59.     Plaintiffs sought payment for the omitted licensed prime contractors' overhead and profit for the Loss.

60.     State Farm has steadfastly refused to pay any of the described amounts to the Plaintiffs.

**STATE FARM'S PRACTICES CONCERNING OVERHEAD AND PROFIT**

61.     Interpreting Tennessee law, the Sixth Circuit has previously held that all of a contractor's overhead and profit should be payable on a claim if "a contractor would reasonably be utilized to make repairs." *Parkway Assoc., LLC v. Harleysville Mut. Ins. Co.*, 129 Fed. Appx. 955, 963 (6th Cir. 2005) (emphasis added). The Sixth Circuit left unanswered the issue of whether the refusal to pay overhead and profit when a contractor is reasonably required constitutes bad faith under Tennessee law. *Id.* at 963, n.4.

62.     In this Amended Complaint, the limited circumstances and monetary thresholds under which Tenn. Code Ann. § 62-6-102 mandates utilization of a licensed prime contractor will be referred to herein as meeting or exceeding "TCLA Thresholds."

63.     State Farm provides property insurance that indemnifies policyholders for accidental direct physical loss to insured structures.

64.     In adjusting and paying claims, State Farm breaches its policies, and encourages the violation of the TCLA, by consistently refusing to pay categories of a prime contractor's overhead and profit referred to in paragraph 53—even on the limited category of claims that meet or exceed the TCLA Thresholds.

12

65.     State Farm knows that state licensure mandates prime contractors to incur overhead expenses not only associated with licensure application, but also associated with employment of a QA skilled in a broad array of labor trades, insurance, financial institution, accounting expenses, as well as experience, net worth, and asset requirements.

66.     Instead of complying with Tennessee law by paying claims for a prime contractor's overhead and profit once the underlying claim meets or exceeds the TCLA Thresholds, State Farm determines whether to pay full overhead and profit by reference to its own internal standards, which sharply conflict with the requirements of Tennessee law in favor of non-payment.

67.     It cannot be reasonably disputed that a prime contractor's overhead and profit must be paid and included in the calculation of actual cash value when a contractor, under penalty of law, must be licensed as a prime contractor to perform the work. Accordingly, these limited categories of property claims must include full payment of the prime contractor's overhead and profit in the calculation of loss.

## CLASS ACTION ALLEGATIONS

### A.     Tennessee Damages and Injunctive Relief Class

68.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this lawsuit as a class action on behalf of themselves and on behalf of all others similarly situated. This action satisfies the requirements of numerosity, commonality, typicality, and adequacy of representation. Only to the extent it is a requirement under applicable law, the class is ascertainable.

69.     The proposed class that Plaintiffs seek to represent is defined as follows:

> All persons and legal entities insured under a State Farm homeowner or property policy insuring property in Tennessee, and for these policyholders: (1) State Farm determined that the policyholder suffered direct physical loss to a dwelling or other structure located

in Tennessee that State Farm determined was covered by the terms of the policy; (2) the estimated costs to make the repairs caused by the covered loss met or exceeded one or more of the thresholds set by the Tennessee Contractor's Licensing Act and mandate that those performing work to repair or replace the damaged property hold a valid Tennessee contractor's license and be a "prime contractor"; and (3) State Farm refused to pay the policyholder for overhead and profit as more fully described herein in its adjusting/settlement of the claim.

70.     Plaintiffs reserve the right to amend the definition of the proposed class. The following persons are expressly excluded from the Class: (1) State Farm and its subsidiaries and affiliates; (2) all persons who make a timely election to be excluded from the proposed class; (3) the Court to which this case is assigned and its staff; (4) any person or entity whose applicable suit limitation clause expired prior to the filing of the instant action; (5) any policyholder who received the full limits of applicable coverage; and (6) Plaintiffs' counsel.

71.     The members of the proposed class are so numerous that joinder of all members is impracticable. Plaintiffs reasonably believe that hundreds if not thousands of people geographically dispersed across Tennessee have been damaged by State Farm's actions. The names and addresses of the members of the proposed class are readily identifiable through records maintained by State Farm or from information readily available to State Farm.

72.     The relatively small amounts of damage suffered by most members of the proposed class make filing separate lawsuits economically impracticable.

73.     State Farm has acted on grounds generally applicable to the proposed class in that State Farm routinely refuses to pay any prime contractor's overhead and profit even where the construction projects exceed TCLA Thresholds. It is reasonable to expect that State Farm will continue to refuse to pay prime contractor's overhead and profit even where a prime contractor's

14

licensure is mandated by the State of Tennessee, thereby making appropriate injunctive and declaratory relief.

74.     Common questions of law and fact exist as to all members of the proposed class and predominate over any questions affecting only individual members. The questions of law and fact common to the proposed class include, but are not limited to:

   a.  Whether State Farm's policy language allows State Farm to refuse to pay prime contractor's overhead and profit when the project exceeds the TCLA Thresholds and prime contractor licensure is mandated by Tennessee law;

   b.  Whether State Farm's policy language is ambiguous concerning the payment of prime contractor's overhead and profit;

   c.  Whether Plaintiffs and members of the proposed class have been damaged as a result of State Farm's withholding of prime contractor's overhead and profit when prime contractor licensure is mandated by Tennessee law;

   d.  Whether Plaintiffs and members of the proposed class are entitled to a declaration, as well as potential supplemental relief, under the applicable declaratory judgment laws; and

   e.  Whether Plaintiffs and members of the proposed class are entitled to punitive damages and the twenty-five percent (25%) statutory bad faith penalty.

75.     Plaintiffs' claims are typical of the claims of all proposed class members, as they are all similarly affected by State Farm's custom and practice concerning refusal to pay prime contractor's overhead and profit when licensure is mandated by law. Further, Plaintiffs' claims are typical of the claims of all proposed class members because their claims arise from the same practices and course of conduct that give rise to the claims of the proposed class members and are based on the same factual and legal theories. Plaintiffs are not different in any material respect from any other member of the proposed class.

76.     Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the proposed class. Plaintiffs' interests do not conflict with the interests of the

15

proposed class they seek to represent. Plaintiffs have retained lawyers who are competent and experienced in class action and insurance litigation. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and their counsel are aware of their fiduciary responsibilities to the class members and will diligently discharge those duties by vigorously seeking the maximum possible recovery for the class while recognizing the risks associated with litigation.

77. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Joining all proposed class members in one action is impracticable, and prosecuting individual actions is not feasible. The size of most individual claims is likely not large enough to justify filing a separate action for each claim. For many, if not most, members of the proposed class, a class action is the only procedural mechanism that will afford them an opportunity for legal redress and justice. Even if proposed class members had the resources to pursue individual litigation, that method would be unduly burdensome to the courts in which such cases would proceed. Individual litigation exacerbates the delay and increases the expense for all parties, as well as the court system. Individual litigation could result in inconsistent adjudications of common issues of law and fact.

78. In contrast, a class action will minimize case management difficulties and provide multiple benefits to the litigating parties, including efficiency, economy of scale, unitary adjudication with consistent results, and equal protection of the rights of Plaintiffs and members of the proposed class. These benefits would result from the comprehensive and efficient supervision of the litigation by a single court.

79. Questions of law or fact common to Plaintiffs and the proposed class members, including those identified above, predominate over questions affecting only individual members

(if any), and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class action treatment will allow a large number of similarly situated consumers to prosecute their common claims in a single forum, simultaneously, efficiently, and without the necessary duplication of effort and expense that numerous individuals would require. Further, the monetary amounts due to many individual proposed class members are likely to be relatively small, and the burden and expense of individual litigation would make it difficult or impossible for individual proposed class members to seek and obtain relief. On the other hand, a class action will serve important public interests by permitting consumers harmed by State Farm's unlawful practices to effectively pursue recovery of the sums owed to them and by deterring further unlawful conduct. The public interest in protecting the rights of consumers favors disposition of the controversy in the class action form.

80.     Class certification is further warranted because State Farm has acted or refused to act on grounds that apply generally to the class, so final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## B.     Tennessee Issues Class

81.     In addition to a Tennessee Damages and Injunctive Relief Class, Plaintiffs also seek to represent a Tennessee Issues Class.

82.     Rule 23.03(4) provides that an action may be brought or maintained as a class action with respect to particular issues.

83.     Pursuant to Rule 23.03(4), Plaintiffs bring this action on behalf of themselves and on behalf of all others similarly situated to resolve, *inter alia*, several important issues relating to State Farm's refusal to pay for prime contractor's overhead and profit, even when Tennessee law

permits only a licensed entity to perform the prime contracting work when exceeding the TCLA Thresholds.

84. Upon resolving some or all of the foregoing issues in favor of the policyholders, the Court could thereafter certify a Tennessee Damages and Injunctive Relief Class. Even if the Court does not certify a damages and injunctive relief class, at the least, a Tennessee Issues Class would permit individual class members to rely upon the preclusive effect of a determination that refusal to pay for prime contractor's overhead and profit, when Tennessee law mandates only licensed prime contractors to perform the project due to its size and scope, breaches State Farm's policies and violates Tennessee law.

85. The Tennessee Issues Class is properly brought and should be maintained as a class action under Rule 23.01, satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy.

86. Individual joinder of the members of the Tennessee Issues Class would be wholly impracticable. As previously stated, Plaintiffs reasonably believe that several hundred if not thousands of people geographically dispersed across Tennessee have been damaged by State Farm's conduct as described herein. Thus, the numerosity element for class certification is met.

87. Questions of law are common to the Tennessee Issues Class. As this is an issues class under Rule 23(c)(4), there are by definition common questions of law applicable to all class members.

88. Plaintiffs' claims are typical of the Tennessee Issues Class because their claims arise from the same course of conduct by State Farm, *i.e.*, its refusal to pay for prime contractor's overhead and profit even where prime contractor retention is required. Plaintiffs' claims are, therefore, typical of the Tennessee Issues Class.

89.     Plaintiffs will fairly and adequately represent and protect the interests of the Tennessee Issues Class. Their interest in vindicating these claims is shared with all members of the Tennessee Issues Class and there are no conflicts between the named Plaintiffs and the putative class members. In addition, Plaintiffs are represented by counsel who are competent and experienced in class action and insurance litigation, and also have no conflicts.

90.     The Tennessee Issues Class is properly brought and should be maintained as a class action under Rule 23.02 because an issues class action in this context is superior. Pursuant to Rule 23.02(b)(3), common issues predominate over any questions affecting only individual class members. Proceeding with an issues class action is superior to other methods for fair and efficient adjudication of this controversy because, *inter alia*, such treatment will allow a large number of similarly situated policyholders to litigate their common claims simultaneously, efficiently, and without the undue duplications of effort, evidence, and expense that several individual actions would induce; individual joinder of the individual members is wholly impracticable; the economic damages suffered by the individual class members may be relatively modest compared to the expense and burden of individual litigation; and the court system would benefit from a class action because individual litigation would overload court dockets and magnify the delay and expense to all parties. The class action device presents far fewer management difficulties and provides the benefit of comprehensive supervision by a single court with economies of scale.

**THE NATURE AND SCOPE OF PLAINTIFFS' RECONSTRUCTION PROJECT NECESSITATED BY THE LOSS REQUIRES PAYMENT OF OVERHEAD AND PROFIT IRRESPECTIVE OF THE TCLA**

91.     Alternatively, as it relates solely to Plaintiffs' individual claims, Plaintiffs are entitled to payment of prime contractor's overhead and profit from State Farm because a prime

contractor would reasonably be required—not simply because of the TCLA—but also to make repairs in light of the scope, nature, and complexity of the work contemplated.

92.     The proposed reconstruction work agreed to by State Farm carries with it a price tag of nearly One Million Dollars, and, even in the absence of controlling law, any reasonable property owner would utilize the services of a prime contractor to perform the work even if such was not required by the TCLA. Irrespective of the application of the TCLA, the factors that demonstrate the extreme need for the services of a prime contractor to perform the necessary work at the Insured Premises include, but are not limited to:

        a.   The size of the project. State Farm has acknowledged in its own estimate of the Loss that the covered damage is nearly One Million Dollars, minus applicable depreciation and the deductible.

        b.   The length of the project. State Farm has acknowledged in its own estimate of the Loss that the time to complete the work on each of the two buildings will be at least 10 weeks, for a total of 20 weeks (5 months), and require such items as portable toilets. A property owner lacks the resources to monitor and oversee such a lengthy reconstruction process.

        c.   Coordination. Proper coordination and supervision is necessary to secure attendance of the numerous sub-contract laborers necessary to perform the work, to facilitate prompt and accurate delivery of materials, and to ensure timely completion of the job. State Farm itself has acknowledged this need in its own estimates of the Loss. A property owner lacks the sophistication to undertake these tasks.

d. <u>Supervision.</u> State Farm has acknowledged in its own estimate that commercial supervision is required in addition to the traditional project foreman. Specifically, State Farm has allowed 160 hours of commercial supervision/project management for each of the two buildings, for a total of 320 hours. A property owner lacks the sophistication to undertake these tasks.

e. <u>Protection of the Property and Safety Concerns</u>. The nature of this project requires OSHA compliance and constant safety monitoring for the protection of both construction workers and third parties that may be in or around the Insured Premises while the work is being completed. At the end of each day of work, care must be taken to properly secure the roof to avoid damage from other storms and to avoid flying debris that could injure those in the area. There are also numerous skylights on the roofs of the two buildings, which present a risk of falling debris and materials to persons and property inside the buildings. A property owner lacks the sophistication to undertake these tasks.

f. <u>Liability considerations</u>. A property owner would not engage and retain a business entity for reconstruction that did not have the assets, liquidity, stability, and proven proficiency to protect the property owner in the event of deficient performance or onsite calamity to person or property. Plaintiffs' selected prime contractor, Titan, has insurance limits of $5,000,000 that would serve to protect Plaintiffs in the event that additional damage occurred during the performance of the work.

g. Such other factors as may be present and to which evidence will be produced at trial.

Any reasonable property owner would secure the services of a prime contractor to perform the work at the Insured Premises that was necessitated by the Loss, even if he or she could find an unlicensed contractor willing to do the work in violation of the TCLA.

## STATE FARM'S FAILURE TO PAY OTHER AMOUNTS
## UNRELATED TO OVERHEAD AND PROFIT

93.     In addition to the separate issue of prime contractor overhead and profit, State Farm has also failed to pay Plaintiffs for other items of damage claimed by and due the Plaintiffs as a result of the Loss.

94.     Specifically, Plaintiffs' prime contractor, Titan, presented State Farm with an estimate for the repairs that are necessary as a result of the Loss. Plaintiffs, by and through Titan, communicated with State Farm on numerous occasions in an effort to resolve their differences. Despite these efforts, State Farm's estimates of the necessary restoration costs were significantly less than the estimates prepared by Titan (which also utilized Xactimate). Specifically, Titan's estimate of the Loss is over $60,000 higher than State Farm's estimate, not including overhead and profit as discussed above. Including overhead and profit, the difference is more than $270,000.

95.     Although a portion of the differences between the estimates of State Farm and Titan are related to State Farm's failure to pay overhead and profit, other differences include, but are not limited to, the following:

   a.   Errors in State Farm's measurements, scope, and quantities;

   b.   State Farm's omission of several items from its estimates, including eave trim, light fixtures, pipe boots, etc.; and

   c.   State Farm's failure to pay for temporary repair costs incurred by Plaintiffs to replace skylight panels broken by hail in order to promptly mitigate losses and to prevent further damage to the roof deck and interior of the building. The

temporary repairs totaled $9,518.79 at 654 North Spring Street (the "Front Building") and $9,409.23 at 650 North Spring Street (the "Rear Building").

96.     Additionally, as result of State Farm's failure to promptly adjust and pay the amounts owed, Plaintiffs have been further damaged as a result of increases in pricing.

**COUNT I**
**BREACH OF CONTRACT**
**FAILURE TO PAY PRIME CONTRACTOR'S OVERHEAD AND PROFIT**

97.     Plaintiffs restate and incorporate by reference all preceding allegations.

98.     State Farm entered into policies of insurance with Plaintiffs and members of the proposed class. These insurance policies govern the relationship between State Farm, Plaintiffs, and members of the proposed class, as well as the manner in which claims for covered losses are handled and paid.

99.     The policies of insurance between State Farm and Plaintiffs and the other proposed class members are binding contracts under Tennessee law, supported by valid consideration in the form of premium payments in exchange for insurance coverage.

100.     State Farm drafted the insurance policies at issue, which are essentially identical in all respects material to this litigation.

101.     Plaintiffs and the putative class members complied with all material provisions and performed all of their respective duties with regard to their insurance policies.

102.     State Farm failed to pay prime contractor's overhead and profit even when the size of the underlying project required licensure under Tennessee law by meeting or exceeding the TCLA Thresholds.

23

103.     State Farm breached its contractual duty to pay Plaintiffs and members of the proposed class the full value of their claims by withholding prime contractor's overhead and profit under these limited circumstances, in the manner described herein.

104.     State Farm's actions in breaching its contractual obligations to Plaintiffs and members of the proposed class benefitted and continue to benefit State Farm. Likewise, State Farm's actions damaged and continue to damage Plaintiffs and members of the proposed class.

105.     State Farm's actions in breaching its contractual obligations, as described herein, are the direct and proximate cause of damages to Plaintiffs and members of the proposed class.

106.     In light of the foregoing, Plaintiffs and members of the proposed class are entitled to recover damages sufficient to make them whole for all overhead and profit amounts State Farm unlawfully withheld.

107.     Plaintiffs and members of the proposed class seek any and all relief as may be permitted under Tennessee law to remedy the ongoing breaches of contract.

108.     Alternatively, and as set forth above in paragraphs 91 to 92, Plaintiffs individually assert that they are entitled to payment of prime contractor's overhead and profit from State Farm because a prime contractor would be utilized to make repairs to their insured property in light of the scope, nature, and complexity of the work necessary as a result of the Loss, without regard to the requirements of the TCLA.

109.     Irrespective of the application of the TCLA, State Farm's failure to pay Plaintiffs prime contractor's overhead and profit constitutes a breach of contract. As a direct and proximate result of State Farm's breach of contract, Plaintiffs have been damaged, for which State Farm must be held liable.

110. State Farm's breaches of contract were intentional, fraudulent, malicious, and/or reckless, and therefore justify an award of punitive damages. *Riad v. Erie Ins. Exchange*, 436 S.W.3d 256, 276 (Tenn. Ct. App. 2013). Specifically, State Farm intentionally, fraudulently, maliciously, and/or recklessly: (1) failed to effectuate a prompt and fair settlement of Plaintiffs' and the proposed class members' claims when liability was clear; (2) unjustly refused to fully and fairly pay Plaintiffs and the proposed class members the amounts to which they were entitled for their own financial preservation with no reasonable or justifiable basis; (3) failed to properly and fully investigate and adjust Plaintiffs' and the proposed class members' claims and to pay such claims fully; (4) failed to pay all amounts due and owing under the subject insurance policies with no reasonable or justifiable basis; and (5) denied full and appropriate payment of Plaintiffs' and the proposed class members' claims with no honest disagreement or innocent mistake concerning the validity or the nature and amount of those claims. State Farm knew, or reasonably should have known, that Plaintiffs and the proposed class members were justifiably relying on the money and benefits due them under the terms of the subject insurance policies. Nevertheless, acting with conscious disregard for the rights of Plaintiffs and the proposed class members and with the intention of causing or willfully disregarding the probability of causing unjust and cruel hardship, State Farm consciously refused to fully compensate Plaintiffs and the proposed class members for their losses, and withheld monies and benefits rightfully due Plaintiffs and the proposed class members. In so acting, State Farm intended to and did injure Plaintiffs and the proposed class members to protect its own financial interests, and should be punished. Plaintiffs and the proposed class members seek, and are entitled to, punitive damages.

## COUNT II
## BREACH OF CONTRACT
## OTHER CONTRACTUAL CLAIMS
### (individual claims only)

111.    Plaintiffs restate and incorporate by reference all preceding allegations.

112.    State Farm failed to pay Plaintiffs the full value of their claim unrelated to its failure to pay prime contractor's overhead and profit (Count I). Specifically (without limitation), State Farm understated the scope of Plaintiffs' loss, omitted necessary items from its estimate, made errors in its measurements and quantities, and refused to pay Plaintiffs for temporary repairs (as stated more fully above in paragraphs 93 to 96). Plaintiffs complied with all material provisions and performed all of their respective duties with regard to their insurance policy.

113.    State Farm's actions in breaching its contractual obligations, as described herein, are the direct and proximate cause of damages to Plaintiffs.

114.    Plaintiffs are entitled to recover damages sufficient to make them whole. Plaintiffs seek any and all relief as may be permitted under Tennessee law, including punitive damages as stated above in paragraph 110, the contents of which are incorporated herein.

## COUNT III
## DECLARATORY JUDGMENT AND RELIEF

115.    Plaintiffs restate and incorporate by reference all preceding allegations.

116.    This Court is empowered by applicable law to declare the rights and legal relations of parties regardless of whether or not further relief is or could be claimed.

117.    A party may seek to have insurance contracts, before or after a breach, construed to obtain a declaration of rights, status, and other legal relations thereunder adjudicated.

118.    Plaintiffs and members of the proposed class have complied with all relevant conditions precedent in their contracts.

119.     Plaintiffs seek, personally and on behalf of the proposed class, a declaration that State Farm's withholding of prime contractor's overhead and profit when the scope of loss mandates the use of a prime contractor licensed under Tennessee law violates their policy and Tennessee law.

120.     Plaintiffs further seek, personally and on behalf of the proposed class, any and all equitable relief available under the law that the Court deems necessary and proper to the administration of justice, including, but not limited to, identifying and locating policyholders, and notifying the same of the circumstances complained of and the restoration of their rights and remediation of their losses, and preclusion by State Farm in engaging in the conduct described herein, as may be permitted by law.

121.     Plaintiffs and members of the proposed class have suffered injuries.

## COUNT IV
## STATUTORY BAD FAITH

122.     Plaintiffs restate and incorporate by reference all preceding allegations.

123.     State Farm's refusal and failure to pay the amounts contractually owed to Plaintiffs and members of the proposed class is arbitrary and capricious and constitutes bad faith pursuant to Tenn. Code Ann. § 56-7-105 in that more than sixty (60) days have passed since a formal demand has been made on State Farm and full payment has not been made for the Loss as required pursuant to the Policy and applicable law, for which the twenty-five percent (25%) statutory penalty for bad faith should be invoked.

124.     The bad faith of State Farm is evidenced by the fact that, at all times material hereto, State Farm knew, or reasonably should have known that Plaintiffs and members of the proposed class were justifiably relying on the money and benefits due them under the terms of the Policy and as otherwise promised and represented by State Farm, as well as the actions of State Farm as

set forth in paragraph 125 below and elsewhere in this Amended Complaint above. Nevertheless, acting with conscious disregard for Plaintiffs' and the proposed class members' rights and with the intention of causing or willfully disregarding the probability of causing unjust and cruel hardship on Plaintiffs and members of the proposed class, State Farm consciously refused to pay in full Plaintiffs' and the proposed class members' valid claim and withheld monies and benefits rightfully due to Plaintiffs and members of the proposed class.

125. State Farm's bad faith is evidenced by all of the facts and allegations set forth above in this Amended Complaint, together with the following:

a. State Farm's intentional failure to fully inform Plaintiffs and members of the proposed class of their rights under the Policy;

b. State Farm's intentional failure to attempt in good faith to effectuate a prompt, fair, and equitable settlement of Plaintiffs' and the proposed class members' claims when liability was reasonably clear;

c. State Farm's intentional refusal to pay Plaintiffs' and the proposed class members' claims in full and to otherwise honor its obligations under the Policy without conducting a reasonable investigation based on all available information;

d. State Farm's intentional refusal to appropriately adjust and investigate Plaintiffs' and the proposed class members' claims and to obtain all available information before alleging that it had no further obligations;

e. State Farm's failure to promptly provide Plaintiffs and members of the proposed class with a reasonable and accurate explanation for its refusal to pay their claims in full;

f.   State Farm's intentional failure to properly adjust Plaintiffs' and the proposed class members' claims and to pay Plaintiffs and members of the proposed class fully for their losses;

g.   State Farm's intentional failure to pay all amounts due and owing to Plaintiffs and members of the proposed class with no reasonable or justifiable basis; and

h.   State Farm's unjustified refusal to pay Plaintiffs' and the proposed class members' claims for its own financial preservation.

126.   In so acting, State Farm intended to and did injure Plaintiffs and members of the proposed class in order to protect its own financial interests, and should be punished via the twenty-five percent (25%) bad faith penalty authorized by statute.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on their claims.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court:

1.   Enter an order certifying this action as a class action, appointing Plaintiffs as the representatives of the class, and appointing Gilbert McWherter Scott Bobbitt, PLC, Larson · King, LLP, and Don Barrett, P.A. as counsel for the class;

2.   Enter a declaratory judgment, declaring that State Farm's failure to pay prime contractor's overhead and profit under the limited circumstances described herein is contrary to applicable law and breaches the insurance policies issued to Plaintiffs and members of the class;

3.   Enter a preliminary and permanent injunction and equitable relief against State Farm and its officers, agents, successors, employees, representatives, and any and all persons

acting in concert with them, from engaging in each of the policies, practices, customs, and usages complained of herein;

4.   Enter an order that State Farm specifically perform and carry out policies, practices, and programs that remediate and eradicate the effects of its past and present practices complained of herein;

5.   Award compensatory damages for all sums improperly withheld, plus prejudgment interest on all such sums, to Plaintiffs and members of the class;

6.   Award the twenty-five percent (25%) statutory bad faith penalty pursuant to Tenn. Code Ann. § 56-7-105 to Plaintiffs and members of the class.

6.   Award punitive damages in an amount equal to nine (9) times Plaintiffs' and class members' actual damages, or in such other amount as may be allowed by law;

7.   Award costs, expenses, and disbursements incurred herein by Plaintiffs and members of the class; and

8.   Grant such further and additional relief as the Court deems necessary and proper.

<div style="margin-left:40%">

Respectfully submitted,

By: /s/ J. Brandon McWherter
J. BRANDON McWHERTER - #21600
GILBERT McWHERTER
SCOTT BOBBITT PLC
341 Cool Springs Blvd, Suite 230
Franklin, TN  37067
(615) 354-1144
bmcwherter@gilbertfirm.com

CLINTON H. SCOTT - #23008
GILBERT McWHERTER
SCOTT BOBBITT PLC
101 N. Highland Ave.
Jackson, TN  38301
(731) 664-1340
cscott@gilbertfirm.com

</div>

T. JOSEPH SNODGRASS
*(Admitted Pro Hac Vice)*
LARSON • KING, LLP
30 East Seventh St., Suite 2800
St. Paul, MN 55101
(651) 312-6500
jsnodgrass@larsonking.com

DAVID McMULLAN, JR.
SARAH STERLING STARNES
*(Admitted Pro Hac Vice)*
DON BARRETT, P.A.
404 Court Square
Lexington, Mississippi 39095
(662) 834-2488
dmcmullan@barrettlawgroup.com
sstarnes@barrettlawgroup.com

***Attorneys for Plaintiffs and***
***Putative Class Representatives***

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that a true and exact copy of the foregoing First Amended Class Action Complaint has been filed and served via the Court's electronic filing system which will send electronic notices of same to all counsel of record, on this the 12th day of October, 2017.

Jason M. Pannu
Bradford D. Telfeyan
LEWIS THOMASON
424 Church Street, Suite 2500
P.O. Box 198615
Nashville TN 37219

Joseph A. Cancila, Jr.
James P. Gaughan
RILEY SAFER HOLMES
& CANCILA LLP
Three First National Plaza
70 W. Madison Street., Suite 2900
Chicago, IL 60602

*s/ J. Brandon McWherter*